Filed 11/25/13  P. v. Warren CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRYANNA NADINE WARREN,<br><br>    Defendant and Appellant. | C067036<br><br>(Super. Ct. No. 09F08633) |

Defendant Bryanna Nadine Warren appeals following a conviction of attempted murder of Lawanda Shoals (Pen. Code, § 664/187)[1] and assault with a firearm on Clifford Brown (§ 245, subd. (a)(2)) with a great bodily injury enhancement as to Shoals (§ 12022.7) and gun use enhancements as to both victims (§ 12022.53, subd. (d) (Shoals); § 12022.5, subd. (a)(1) (Brown)).  This case stems from a dispute between defendant and

---

[1]  Undesignated statutory references are to the Penal Code.

1

Shoals, culminating when defendant forcibly entered the apartment where Shoals and Brown resided, shot Shoals in both legs and shot at Brown, grazing his buttocks. The defense at trial was that defendant believed she had access to the apartment at Brown's invitation and that she acted in self-defense when Shoals aggressively approached her inside the apartment.

On appeal, defendant contends the trial court erred in allowing Shoals to testify about the subsequent murders of Brown and their roommate, James Turner. Defendant argues that this evidence was irrelevant and unduly prejudicial under Evidence Code sections 210 and 352 and also that its admission violated her state and federal due process rights to a fair trial. Defendant further contends that the trial court erred in denying her motion to continue the sentencing hearing so that her counsel could determine whether there were grounds for a new trial motion.

We conclude: (1) Defendant forfeited her state and federal due process claims by failing to raise them in the trial court; (2) even assuming there was error in admitting evidence about the Brown/Turner murders, it was harmless under any standard; and (3) the trial court did not abuse its discretion in denying defendant's motion to continue the sentencing hearing.

We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Evidence

In November 2009, Lawanda Shoals and her fiancé, Clifford Brown, lived together in a two-bedroom apartment. A roommate, James Turner, also resided in the apartment. Shoals and Brown had an argument and Shoals moved home with her parents for a few days, but the two continued to speak over the phone every day. During this period of time defendant, who lived with her boyfriend, George Wallace, had an argument with Wallace, and went to stay with Brown and Turner for a few days.

2

On Thanksgiving Day, November 26, 2009, Shoals returned to her apartment with a plate of Thanksgiving dinner for Brown. Brown's two daughters accompanied Shoals. Defendant answered the door. Because Shoals had told defendant that she was not welcome in their home during an earlier encounter,[2] Shoals asked defendant what she was doing in her apartment. Defendant laughed and responded, "Yes, bitch, I'm in your house." Brown came out of the bedroom and closed the door on Shoals, then argued through a window with Shoals about defendant's presence in their apartment.

After arguing for several minutes, Shoals went to her car and began to drive away but decided to return. Because it was her apartment, Shoals felt that defendant should be the one to leave. Shoals kicked in the kitchen door and entered the apartment, where she confronted defendant and told her to leave. Defendant advanced on Shoals, and the two began hitting each other. Brown, Turner, and Brown's daughters broke up the fight. After the fight, Shoals and Brown's daughters left the apartment.

Brown reported the fight to the police, describing Shoals as an ex-tenant who had kicked in the door and assaulted his friend who was visiting. The police did not respond immediately because Brown would not provide the friend's information. However, approximately 30 minutes later, Brown called the police again, identified defendant as the friend, and asked for medical assistance. When a police officer arrived, defendant stated that she did not want to prosecute. Subsequently, several officers attempted to follow up with defendant at her various listed addresses and by phone, but defendant did not respond.

---

[2] Two to three months prior, defendant came to the Shoals/Brown residence at 1:00 a.m., and Shoals told defendant that she "did not appreciate [defendant] coming to [Shoals's] house at that time of the morning." Defendant denied ever meeting Shoals before Thanksgiving and testified that this confrontation never occurred.

Later Thanksgiving night, Shoals and Brown reconciled over the phone, and Shoals moved back into their apartment the following day. That day, defendant called Brown's phone and Shoals spoke to her. Defendant apparently told Shoals she had left her identification, because Shoals testified that she told defendant she would put defendant's identification in the mail. Shoals told defendant not to come back to the apartment.

Around 7:00 o'clock the following morning, November 28, Shoals and Brown were awakened by defendant banging loudly on the front door. Shoals looked through the blinds and saw defendant. Shoals then went back to the bedroom and told Brown, "That crazy bitch is at the door. You need to go take care of that," and asked him to call the police. Shoals got back into bed and then heard defendant kick in the kitchen door, which had been repaired and was locked with a deadbolt. Shoals walked to the doorway of the bedroom. Defendant, who had entered the apartment, pointed a gun at Shoals's head and threatened, "Bitch, I'm gonna kill you." Shoals threw her arm up to knock the gun away from her face and closed the bedroom door, attempting to hold it shut to keep defendant out. Defendant fired two shots through the bedroom door. One of the shots struck Shoals in the right thigh. Defendant then came through the door pointing the gun. Shoals hit defendant in the face and then grabbed the hand in which defendant held the gun. As the two struggled over the gun, defendant placed the gun against Shoals's left leg and shot her a second time.

Brown entered the bedroom to break up the fight and defendant turned toward him and said, "Nigger, you want some, too?" Defendant then fired a shot at Brown, grazing his buttocks. Shoals "went for the gun" again, and defendant fired additional shots until the gun was empty. Shoals was able to restrain defendant while the police were called. However, Shoals became weak and defendant managed to escape before the police arrived.

4

A police officer observed two bullet holes in the bedroom door, a bullet hole in the west wall of the bedroom and another bullet hole along the baseboard of the south wall. Two bullet fragments and one intact bullet were found in the bedroom and a mushroomed bullet was found lodged near the doorway. One of the two bullet holes in the door had soot around it, suggesting that it came from the hallway outside the bedroom door and that the gun was held close to the door when the shot was fired. The bullet wound to Shoals's right thigh -- the first of the two bullet wounds inflicted by defendant -- also had soot around it consistent with the hole in the door. The strike panel for the kitchen door was splintered.

An officer went to the apartment defendant shared with Wallace looking for her. Defendant was not there, but Wallace was. Several days later, defendant was arrested at a motel where she was registered with Wallace.

After her arrest, defendant told a detective that on Thanksgiving, she had been in a fistfight on Broadway near Stockton Boulevard with three women she did not know. Defendant did not know why the women fought her. Defendant said that after the fight, she was picked up by an old lady, at whose house she was temporarily staying. Defendant said she lied about the fight to the officers who responded to the apartment on Thanksgiving because she was afraid of the three women who had fought her. She said the women had her identification and she feared they would retaliate if she made a police report. Defendant denied ever having a fight with Shoals on Thanksgiving at the Shoals/Brown residence. Defendant said that on the morning of November 28, she went to a pharmacy. After she found it was closed, she returned to the old lady's residence to thank her for allowing her to stay. When defendant entered the old lady's house through a side door, she saw one of the women who had fought her on the street corner on Thanksgiving. Defendant later identified the woman as Shoals. Because she was scared, defendant pulled her gun and pointed it at Shoals. Defendant said Shoals advanced toward her, so defendant shot Shoals in the leg and then fired more

5

shots because Shoals continued to advance. She told the detective that an unknown male grabbed her from behind and tried to wrestle her to the ground. She said she was able to break free and flee the area. After being shown a photograph of Brown and initially denying that she knew him, she later identified Brown as the man who had grabbed her from behind. She said Brown lived at the old lady's residence, but was hardly ever there and that the old lady lived with another person named Filmore Slim. Multiple times, defendant denied knowing why Shoals wanted to fight her, but eventually said she thought it was because Shoals thought defendant was trying to "get with" Brown. Defendant denied going to the residence on November 28 to confront Shoals and maintained she had gone there to talk to the old lady and thank the old lady for allowing her to stay at the residence. Several times, defendant told the detective that this was the truth.

Shoals testified that in the late evening hours of December 14, 2009, Shoals and Brown were watching television in their bedroom when they heard a loud bang coming from the kitchen area. Brown went to the hallway to investigate and then yelled "Oh shit," and ran back in the bedroom, pulling Shoals to the floor next to the bed. As she was being pulled onto the floor, Shoals saw a large man wearing a ski mask and a bulletproof vest in the hallway with a shotgun walking toward Turner's room. Shoals then heard a shotgun blast come from Turner's room. Brown rose up from the floor, and the armed man shot him in the abdomen. Then Brown told Shoals, "Baby, I love you. I'm going to die. I'm not going to let anything happen to you." Brown then rose up again, and the armed man shot him in the face. Brown fell to his knees, gurgling, and held Shoals's ankle. The parties stipulated that defendant's boyfriend, Wallace, had been convicted of killing Brown and Turner. The parties also stipulated that defendant did not instigate or participate in the murders.

The defense theory was that defendant suffered from posttraumatic stress disorder (PTSD) and had acted in what she believed to be self-defense. Defendant

6

testified that on the morning of November 28, 2009, she went to a pharmacy to pick up some medications, but discovered it was closed. Instead of returning home, she went to the Shoals/Brown apartment. She said she went there because she was still irritated with Wallace and did not want to go back home. Defendant explained that she knocked on the front door but no one answered, so she entered the apartment through the side door because the lock was broken. Defendant also testified that Brown always kept that door unlocked. She said she brought the gun with her for self-protection because she had been "jumped" on Thanksgiving and was not thinking clearly. She did not have the gun with her on Thanksgiving. Defendant testified that after she entered the apartment and approached the bedroom, Shoals came running toward her in the hallway to try to hit her, so defendant raised the gun and told Shoals, "Back up. I have a gun, I don't want to shoot you." Defendant said Shoals continued to come toward her, so she fired a shot but did not realize she had hit Shoals. She testified that Brown then grabbed her from behind, the three began to struggle and the gun continued to fire as they struggled. Defendant said she struggled to keep the gun because she did not want Shoals to take it and give it to the police. Defendant said she was able to break free and run away. Defendant explained that she lied to police because she was afraid Wallace would be angry that she had stayed with Brown, even though she did not have a romantic relationship with Brown.

Dr. Linda Barnard, a licensed marriage and family therapist, opined that defendant suffered from PTSD due to various traumatic events throughout her life, including molestation as a child, living on the streets where she was raped and beaten, and the assault a few days prior to the shooting. Dr. Barnard explained that PTSD can produce hypervigilance, which causes a person to see danger where others would not. She further opined that someone with PTSD who had been beaten and later encountered the assailant would view the person with "more of a sense of danger."

7

**Verdict and Sentencing Hearing**

The jury convicted defendant of the charged crimes and found the enhancements true. On December 9, 2010, defendant was sentenced to state prison for an indeterminate term of 25 years to life plus a determinate term of 10 years. As we discuss in more detail *post*, on the day of sentencing, defendant moved for a continuance to investigate grounds for a new trial. The motion was denied.

## DISCUSSION

### I. Evidence of the Murder of Brown and Turner

### A. Background

In an in limine motion, the prosecution requested that the court inform the jury that Wallace had been convicted of murdering Brown and Turner and that the jury found true the witness-murder special circumstance which alleged that the murders were committed to prevent Brown and Turner from testifying in defendant's trial. The prosecution further requested the jury be instructed that defendant was not a party to that crime and that the jury could only consider that information as it related to why Brown and Turner would not be testifying in defendant's case.

The defense, in its in limine briefing, moved to exclude evidence of Wallace's convictions for the Brown and Turner murders. Counsel objected to the admission of this evidence as irrelevant and prejudicial.

The trial court indicated it would preclude evidence that Wallace was convicted of the murders, but it would allow Shoals to testify that Brown and Turner had been murdered, without identifying the perpetrator of the murders. The court stated, "it's hard for the Court to imagine how the jury would be properly able to weigh [Shoals's] testimony . . . without her testifying in response to the question as to where [Brown and Turner] are currently and her being able to say she was present when somebody came in and killed them on December [14], 2009. [¶] That doesn't appear to the Court that it establishes who that was, but the representations here are

8

that it's by some men in black -- or man in black with a black ski mask. [¶] So it seems to the Court that it would be improper to preclude that question from being put to the witness. It has to do with her testimony in this case. [¶] I realize it's an event after the fact, but it seems to me were the Court to grant the motion and say yes, there will be no testimony that George Wallace was convicted of murdering these people, it doesn't seem to the Court if that I'm looking and trying to do a[n Evidence Code section] 352 analysis and weighing the probative value against the potential for confusion or misleading the jury or having them inappropriately respond to this testimony, it doesn't seem like we're going to have a trial within a trial because we're not going to have the prosecutor looking to have her express opinions as to who that was or wasn't in this particular case. [¶] But granting the motion and saying there's not going to be any mention of the conviction of George Wallace, from the Court's standpoint doesn't preclude the complaining victim from coming in and saying what she knows happened to . . . percipient witness[es] to the events that are going to be talked about in the case."

Defense counsel contended that Shoals need only testify that Brown and Turner were deceased and there need not be any testimony about how and when they died. Counsel also expressed concern that the evidence concerning the murders could grow and grow until it resembled the factual allegations underlying defendant's charges.

As we have noted, Shoals testified about the murders but did not identify the perpetrator. The parties stipulated that Wallace had been convicted of killing Brown and Turner and that defendant did not instigate or participate in these homicides.

### B. Analysis

Defendant contends the trial court erred in admitting evidence about the murders of Brown and Turner over her relevance and Evidence Code section 352 objections. Defendant also contends that admission of the testimony violated her due process right to

9

a fair trial. The People contend that the evidence was relevant on the issue of Shoals's "credibility vis-à-vis" defendant's credibility and explained why Brown and Turner did not appear as witnesses in defendant's case. The People further contend that the jury needed to know the whole story of all the participants to assess the credibility of Shoals and defendant, and the evidence concerning the murder "completed the narrative arc of the interactions between all the parties."

## 1. Forfeiture of Constitutional Claims

The People contend that because defendant did not raise any constitutional claims in the trial court, those claims are now forfeited. Defendant does not respond to this argument directly in her reply brief but instead contends, "To the extent this court finds [defendant's] federal constitutional claims to be waived, [defendant] has received ineffective assistance of counsel."[3]

The general rule is that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. (*Partida*, *supra*, 37 Cal.4th at p. 431; *People v. Raley* (1992) 2 Cal.4th 870, 892.) Because defendant objected only on statutory grounds to the admission of evidence regarding the deaths of Brown and Turner, her constitutional arguments are not cognizable on appeal. (*Partida*, *supra*, 37 Cal.4th at p. 435; *Raley*, *supra*, 2 Cal.4th at p. 892.)

Moreover, because defendant, in her reply brief, belatedly raises a claim of ineffective assistance of counsel, we deem that argument forfeited as well. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 ["Courts will ordinarily treat

---

[3] Defendant does not reply that the asserted error in overruling her state evidentiary objections had the legal consequence of violating her due process rights. (See *People v. Partida* (2005) 37 Cal.4th 428, 431 (*Partida*).) We presume this is because defendant contends the trial court should have engaged in a due process analysis that was different from its relevance and Evidence Code section 352 analysis. (*Partida*, *supra*, at p. 435.)

10

the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge"].)

## 2. Harmless Error

We need not reach the issue of the admissibility of the evidence concerning the Brown/Turner murders, because even if the admission of Shoals's testimony was error, we conclude any error was harmless. "It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citations.] '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

The evidence against defendant included her own admission that she brought the gun to the Shoals/Brown residence and shot at Shoals, although she claimed she used the gun in self-defense because she was afraid. Defendant's testimony was inconsistent with her earlier statement to the police that she returned to the home to thank an "old lady" who lived there. Additionally, defendant's testimony that she shot only because Shoals was running toward her was inconsistent with the forensic evidence. The forensics showed there were two bullet holes in the bedroom door, one of which had soot around it, which suggested that it came from outside the bedroom door and that defendant held the gun close to the door when she fired that shot. This evidence matched the wound to Shoals's right thigh, which also had soot around it. This forensic evidence was consistent with Shoals's testimony that she was attempting to hold the bedroom door shut to protect herself when defendant fired through the door, striking Shoals in the leg. Thus, the forensics were consistent with Shoals's testimony describing defendant as the aggressor, and inconsistent

11

with defendant's testimony that she acted in self-defense. Shoals's testimony that defendant was the aggressor was also more consistent with defendant entering through the kitchen door after no one answered the front door.

Defendant asserts that the evidence of what occurred on Thanksgiving Day, including Shoals telling a police officer that she "whooped [defendant's] ass" showed that Shoals was the aggressor. We see that evidence differently. It shows defendant had a motive to seek out Shoals, whom she knew was back in the house because she spoke with her on the phone.

Further, defendant changed her story about the shooting, while Shoals's initial statement to the police was largely consistent with her trial testimony. Indeed, we see defendant's earlier story to the police -- in which she denied going to the apartment to confront Shoals and said she was only there to visit an old lady who had helped her after a fight that had purportedly taken place on a street corner -- as an attempt to cover up her motive for returning to the apartment. Additionally, when police were called about the Thanksgiving Day altercation, defendant stated that she did not want to prosecute, and several officers attempted to follow up with defendant, but she did not respond. This suggests that defendant decided to take matters into her own hands.

Based on the evidence, it is likely the jury would have found defendant not credible and Shoals credible regardless of the testimony about Brown's and Turner's murders.

Further, the testimony about the Brown/Turner murders did not implicate defendant. The jury was specifically cautioned that defendant was not involved in those murders in any way. The testimony, while emotional, was relatively brief, and the prosecutor did not mention this evidence in her opening statement or closing argument. It was hardly the focal point of defendant's trial.

Defendant complains on appeal that "the jury was told that her partner and the father of one of her children, George Wallace, was convicted of the murders. No

12

reasonable juror could have failed to make the connection between [defendant], Mr. Wallace, and the murders." Yet, it was not the trial court that allowed this evidence. Indeed, the trial court indicated it would preclude evidence concerning the identity of the killer. The jury only learned that Wallace was the perpetrator because of the stipulation agreed upon by both sides.

In light of the overwhelming evidence against defendant and the stipulation cautioning the jury that defendant was not involved in the Brown/Turner murders, we conclude it was not reasonably probable that defendant would have obtained a more favorable result had the evidence not been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Indeed, assuming defendant's due process objection had been preserved and had merit, we would conclude that any error is harmless even under the "beyond a reasonable doubt" standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].

## II.  Denial of Defendant's Motion for a Continuance

### A.  Background

On the day of sentencing, defendant's counsel requested a continuance to determine whether there were grounds for a new trial motion. Counsel asserted that statements in the probation report attributed to Shoals were inconsistent with her trial testimony. Specifically, the probation report indicated that prior to the shooting, Shoals was attending school and working for the federal government. This, defense counsel contended, was inconsistent with testimony Shoals had given on cross-examination in the prosecution's rebuttal case, in which Shoals purportedly said she was with Brown "24 hours a day, seven days a week."[4] Defense counsel argued that the statement in the

---

[4] The words "24 hours a day, seven days a week" were not words used by Shoals during her testimony. Nor were those words used by trial counsel in any question posed to Shoals during that testimony. However, Shoals did testify that she was with Brown 90 percent of the time.

13

probation report showed that Shoals was not with Brown as much as she had indicated and that this showed it was not impossible for defendant to form a friendship with Brown. Defense counsel further asserted, "[w]hen she lies about anything, I think that would be significant," and asked for time to investigate the statements to determine if there were grounds for a new trial motion.

The trial court stated that it reviewed its trial notes and specifically remembered that when defense counsel questioned Shoals about the time she spent with Brown, "it was obvious from my looks at the jury that they understood that that was not accurate, this person was not spending 24 hours a day with the person literally." The court concluded that the potential impeachment evidence was on a collateral issue and immaterial to the evidence at trial and denied the motion for a continuance.

### B. Analysis

Defendant contends the trial court erroneously denied her continuance motion, asserting that it was grounded on good cause and the trial court's refusal to grant a continuance denied defendant of her constitutional right to due process.

"A continuance in a criminal case may be granted only for good cause. (§ 1050, subd. (e).) Whether good cause exists is a question for the trial court's discretion. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 450, citing *People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) Upon application of a defendant, the trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. 8.) "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial;

14

and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

It is well settled that, " '[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered [evidence] is as impeaching evidence' or to contradict a witness of the opposing party." (*People v. Hall* (2010) 187 Cal.App.4th 282, 299, quoting *Hanton v. Pacific Electric Ry. Co.* (1918) 178 Cal. 616, 623 & citing *Pandolfo v. Jackson* (1936) 12 Cal.App.2d 232, 236.) Defendant nevertheless claims it is reasonably probable that the impeachment of Shoals's testimony about being with Brown "24 hours a day" would have achieved a more favorable result for defendant on retrial because the case turned entirely on the credibility of Shoals and defendant. We are not persuaded.

While we agree that the case turned on the credibility of Shoals and defendant, the trial court did not abuse its discretion in finding that this possible impeachment evidence was on a collateral issue and immaterial to the evidence at trial. The testimony defendant sought to impeach does not relate to the incident in which defendant shot Shoals and Brown. In any case, as the trial court pointed out, it is unlikely that the jury believed that Shoals was "spending 24 hours a day with [Brown] literally." Defendant's argument that Shoals was not actually with Brown constantly and therefore did not know that defendant had been friends with Brown for an extended time before the incident is immaterial to the circumstances of the shooting and Shoals's testimony about the shooting. Whether defendant had been with friends with Brown hardly justifies her armed entry into the Shoals/Brown apartment on the morning of the shooting.

Finally, as previously discussed, the evidence against defendant was compelling. We conclude that impeachment on this collateral matter would not "render a different result probable." (*Delgado*, *supra*, 5 Cal.4th at p. 328.)

Accordingly, the trial court did not abuse its discretion in denying defendant's motion to continue the sentencing hearing.

15

**DISPOSITION**

The judgment is affirmed.

                                                                      MURRAY_____, J.

We concur:

_____NICHOLSON_____, Acting P. J.

_____HOCH_____, J.